**KING MOENCH HIRNIAK & COLLINS, LLP**
Matthew C. Moench, Esq (031462007)
51 Gibraltar Drive, Suite 2F
Morris Plains, New Jersey 07950-1254
973-998-6860
973-998-6863 (facsimile)
MCM@kmhmlawfirm.com

**GRAVES GARRETT, LLC**
Edward D. Greim (Mo. Bar #54034)*
Paul Brothers
1100 Main Street, Suite 2700
Kansas City, MO 64105
Phone: (816) 256-3181
Fax: (816) 256-5958
edgreim@gravesgarrett.com
*Pro Hac Vice Application Forthcoming*

*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **ROBERT PEEDE, JR.,** | |
| Plaintiff, | Civil Action No._____ |
| v. | |
| **CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS** | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Defendant. | |

PLAINTIFF Robert Peede, Jr., by and through his counsel, Graves Garrett LLC and King Moench Hirniak Mehta & Collins, LLP, for his Complaint against Defendant Cellco Partnership d/b/a Verizon Wireless ("Verizon"), state and allege as follows:

1.     This is an action to protect the Plaintiff from a Congressional subpoena (the "Subpoena") that lacks a lawful purpose and seeks to invade Plaintiff's constitutional rights to privacy and to confidential political communications. Plaintiff was Deputy Assistant to the President and Director of Presidential Advance, and he and his staff planned and coordinated the logistics of the President's attendance at the Ellipse Rally with Rally planners and organizers. Plaintiff has provided Congressional investigators with unredacted copies of every responsive document and communication in his possession. Plaintiff also sat for a deposition and answered every single question posed by four Select Committee attorneys and one Member of Congress. The Select Committee concluded Plaintiff's deposition after exhausting all questions they had for him, including questions about whom he had spoken with and when. Shortly after Plaintiff's deposition concluded, the Select Committee informed Plaintiff he had fulfilled his obligations under the subpoena, and the Select Committee appreciated his cooperation. However, on the same day Congress received answers from Plaintiff to every question they had and informed him he had fulfilled his obligations, Congress indiscriminately demanded Defendant Verizon Wireless, Plaintiff's telecom carrier, provide detailed information about his accounts, contacts, personal and political associates, and physical locations. The subpoena covers a three-month period that greatly exceeds the 11-day window of time about which Congress questioned Plaintiff.

2.     This subpoena was not issued by a validly constituted committee; is not pertinent to the matter Congress is purporting to investigate; does not pursue a legislative purpose; violates Plaintiff's First and Fourth Amendment rights; and violates the Stored Communications Act, 18 U.S.C. § 2701, et seq. The Plaintiff seeks judgment declaring that the subpoena is invalid and enjoining Defendant, Verizon Wireless, from producing his data to the Select Committee.

## THE PARTIES

3.      Plaintiff Robert Peede, Jr. is a resident of Arlington, Virginia. On January 21, 2022, he received notice from Defendant that it was served with a subpoena for his cell phone records (the "Subpoena"), attached hereto along with the transmittal letter as Exhibit A.

4.      Defendant Cellco Partnership d/b/a Verizon Wireless has a principal place of business in New Jersey. Verizon's "Security Subpoena Compliance" has its principal office at 180 Washington Valley Road, Bedminster, Somerset County, New Jersey. It is from this address that Verizon addressed its letter to Plaintiff advising him of the Subpoena.

## JURISDICTION AND VENUE

5.       This case challenges the validity of a Subpoena issued by a body calling itself the Select Committee to Investigate the January 6 Attack on the United States Capitol (the "Select Committee"). It raises claims regarding the scope of the investigative power of Congress under Article I of the United States Constitution, claims arising under the First and Fourth Amendments of the United States Constitution, and claims arising under the Stored Communications Act, 18 U.S.C. § 2701, et seq.

6.      The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and §1343.

7.      The Court has personal jurisdiction over Defendant Verizon because its principal place of business is in New Jersey, and its acts in responding to the Subpoena, communicating with Plaintiff about Subpoena, and, potentially, in producing data responsive to the Subpoena, were or will be undertaken in and from New Jersey.

8.       For the same reasons this Court has personal jurisdiction, venue in this Court is proper under 28 U.S.C. § 1391(b).

**BACKGROUND ALLEGATIONS**

9.       On January 6, 2021, a group of protesters breached the Capitol grounds, entered the Capitol, and, by causing disorder, successfully delayed the certification of the votes of the electors for the 2020 presidential election by several hours.

10.       On June 30, 2021, the House of Representatives passed H. Res. 503 (the "Resolution"), establishing "the Select Committee to Investigate the January 6th Attack on the United States Capitol." The Resolution was passed just two days after its introduction, with two Members caucusing with Republicans voting "yea."

11.       Under Section 2(a) of the Resolution, "the Speaker shall appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader." The Resolution also required that "[t]he Speaker shall designate one Member to serve as chair of the Select Committee." H. Res. 503 § 2(b), 117th Cong. (2021).

12.       The Speaker appointed only 9 Members to the Select Committee. The Speaker did not appoint any Members after consultation with the House Minority Leader, Representative Kevin McCarthy. Rather, the Speaker appointed the only two Members who currently caucus with the Republican Party and who had voted for the Resolution. The Speaker failed to appoint any Member suggested by the House Minority Leader.

13.       The Speaker did not appoint a Ranking Member. The Select Committee does not have a Ranking Member.

14.       The Resolution identifies a total of three "purposes" of the Select Committee. They are: (1) to "investigate and report upon the facts, circumstances, and causes relating to the January 6, 2021 domestic terrorist attack on the United States Capitol Complex… and relating to the interference with the peaceful transfer of power, including the facts and causes relating to the

preparedness and response of [law enforcement and other instrumentalities of government], as well as the influencing factors that fomented such an attack…"; (2) to "examine and evaluate evidence developed by relevant Federal, state, and local government agencies regarding the facts and circumstances surrounding the domestic terrorist attack on the Capitol and targeted violence and domestic terrorism relevant to such terrorist attack"; and (3) to "build upon the investigations of other entities and avoid unnecessary duplication of efforts by reviewing the investigations, findings, conclusions, and recommendations of other [investigations] into the domestic terrorist attack on the Capitol, including investigations into influencing factors related to such attack."

15.     The Resolution identifies a total of three "functions" of the Select Committee. They are: (1) to "investigate the facts, circumstances, and causes relating to the domestic terrorist attack on the Capitol"; (2) to "identify, review, and evaluate the causes of and the lessons learned from the domestic terrorist attack on the Capitol regarding" various federal governmental operations; and (3) to "issue a final report to the House containing such findings, conclusions, and recommendations for corrective measures described in subsection (c) as it may deem necessary."

16.     Subsection (c) of Section 4 describes three categories of "corrective measures": "changes in law, policy, procedures, rules, or regulations that could be taken" (1) "to prevent future acts of violence, domestic terrorism, and domestic violent extremism, including acts targeted at American democratic institutions"; (2) "to improve the security posture of the United States Capitol Complex while preserving accessibility of the Capitol Complex for all Americans"; and (3) "to strengthen the security and resilience of the United States and American democratic institutions against violence, domestic terrorism, and domestic violent extremism."

17.     The Select Committee has established a website that reports on its proceedings and publishes statements by the Committee's Speaker-designated Members—that is, the Committee's

only Members. See https://january6th.house.gov/

18.     The Select Committee held its first and only hearing on July 27, 2021.

19.     Approximately one month later, the Select Committee's Chairman wrote to over thirty telecom and social media companies to demand that they preserve all metadata and content of their customers' communications, and that they not disclose the request to their customers. Upon information and belief, the Plaintiff's account was included in this request.

20.     Upon information and belief, at least some of the recipients of the letter, including Verizon, were required to copy account and content data in order to protect it from automated deletion and comply with the Select Committee's preservation demand.

21.     On December 10, 2021, the Select Committee publicized its issuance of a subpoena to Plaintiff for the production of documents and a deposition. See Exhibit B. A letter signed by the Select Committee Chairman, which accompanied the subpoena, claimed that his testimony and documents were relevant because he was present for a meeting on January 4, 2021, at the White House with Max Miller, Katrina Pierson, and President Trump where a discussion of planning for the Ellipse Rally occurred.

22.     Plaintiff fully cooperated with the subpoena by producing all responsive documents and communications in his possession without redactions as well as providing testimony. While Plaintiff asserted committee formation, pertinence, legislative purpose, and First and Fourth Amendment objections, he did not use these objections to withhold any responsive documents or communications in whole or in part.

23.     Additionally, the Plaintiff did not at any time object to any questions concerning who he communicated with regarding the Rally, when they communicated, and what they communicated about.

24.     The Plaintiff's information showed that although he was involved with organizing the logistics of the President's appearance at the Rally, he had no knowledge of how speakers or content for the Rally was selected. He also did not have any knowledge about any plan for Rally-goers to march to the Capitol or of specific security concerns posed by the Rally.

25.     The Plaintiff's involvement was limited to logistical planning for the President's attendance and speech at the Rally. This planning included stage design and layout, security requirements, and other elements of the President's arrival and departure from the Rally.

26.     At the meeting at the White House on January 4, 2021, the Plaintiff was tasked with presenting the President with the logistical plans for his attendance and speech at the Rally. The Plaintiff's presentation included informing the President of the stage layout and design and logistics for his arrival and departure. The Plaintiff's portion of the presentation was at the end of the meeting, and he spent the beginning portion of the meeting preparing for his presentation. The Plaintiff has no recollection of any discussion of speakers that occurred between Ms. Pierson and the President.

27.     On January 6, 2021, the Plaintiff arrived at the Rally separately from the President. He reviewed the stage and site to ensure all logistical items and processes were in place. He greeted the President when he arrived at the Ellipse and escorted him directly onto the stage to begin his speech. During the speech, the Plaintiff walked around the event site monitoring various logistical aspects of the event and assisting media members. After the President's speech concluded, the Plaintiff ensured the President returned to his motorcade and left the event site. Plaintiff remained at the event site before returning to his office in the Eisenhower Executive Office Building. Plaintiff did not have any further interactions with the President regarding the Rally or the events of January 6th.

28.     Throughout the entire 10 days the Plaintiff was involved in planning and executing the logistics of the President's attendance at the Rally, the Plaintiff primarily relied on his government-issued cell phone to communicate about the Rally. To the extent the Plaintiff used a cell phone at all for official business, he used his government-issued cell phone.

29.     Plaintiff's documents and deposition testimony fully disclosed all details of the Plaintiff's involvement with and knowledge of the Ellipse Rally and events of January 6th whether his involvement and knowledge arose before, during, or after January 6th. In short, with respect to the Ellipse Rally and the events of January 6th, the Plaintiff does not possess any information he has not already made known to the Select Committee. The Select Committee already has all of the information from Plaintiff that is relevant to its inquiry.

30.     Nonetheless, on or about January 19, 2022, the Select Committee issued a subpoena to Defendant Verizon, demanding production of a mass of cell phone data for Plaintiff by 10:00 a.m. on February 2, 2022. News reports suggest that Plaintiff is just one of over 100 individuals whose accounts have been subpoenaed. https://www.cnn.com/2021/12/07/politics/january-6-committee-phone-records/index.html

31.     The January 19 Subpoena to Verizon—the only subpoena at issue here—clearly covered a number of individuals. "Part A" of the Subpoena explains its scope. "Part B" of the Subpoena apparently included the phone numbers of many Verizon customers whose account data was being subpoenaed, and for that reason, Verizon did not transmit Part B to the account recipients.

32.     According to Part A, the Select Committee seeks all subscriber information and cell phone data associated with Plaintiff's personal cell phone numbers, including Plaintiff's early-teenage children, John Does 1 and 2. The subscriber information requested includes subscriber

names and contact information, authorized users, time of service provided, account changes, associated IP addresses, and other metadata. The cell phone data requested could include all calls, text messages, and other records of communications associated with that phone number. This data can be used for historic cell site analysis. See Ex. A.

33.     Additionally, despite the fact that Plaintiff's complete involvement with the Ellipse Rally spanned only 10 days in late December 2020 and early January 2021, the Select Committee sought personal cell phone data for three months: from November 1, 2020 to January 31, 2021. Having spent hours with him under oath, the Select Committee is well aware that Plaintiff cannot have had relevant communications that late or that early in time. Nor does the Select Committee have a good-faith basis for believing that the phone data has relevant communications even for the 10-day period that it is supposedly investigating. And there is certainly no basis for obtaining information about the Plaintiff's children's cell phones.

34.     Assuming that dozens or perhaps hundreds of other individuals' private data is being sought with the same one-size-fits-all, multi-month request that fails to match the specific relevance (if any) of a given individual to the investigation, the Select Committee is clearly planning to do far more than "double check" to ensure that cooperating witnesses' previous document production or testimony was complete.

35.     Instead, the Select Committee's Subpoena will yield data that will be used to populate a massive database of the personal friends and political associates of everyone who has any connection to the Trump campaign or administration. By analyzing data patterns in phone numbers, length of calls, texts, and geolocation data, investigators can build a permanent nationwide model of intimate political associations and networks within the conservative movement that has relevance far beyond "legislating" to deal with Capitol security, election

integrity, or the processes for certifying electoral votes. The billions of data points yielded can recreate not just intimate relationships, but also locations and movements, creating a virtual CAT-scan of the Select Committee's political opposition, likely including even their own colleagues in the House of Representatives.

36.     This massive opposition research project dwarfs anything ever attempted or conceived in the history of the Congress. It bears more similarity to a foreign intelligence operation or a domestic criminal investigation than to a good-faith effort to secure the facts needed to draft legislation or oversee an executive agency. The Select Committee has lost its bearings.

**Count I**
**(Subpoena Is Invalid Because the Select Committee Is Not Properly Constituted)**

37.     Plaintiff repeats, re-alleges, and incorporates the allegations in paragraphs 1–36 as if the same were set forth verbatim herein.

38.     The power of authorized congressional committees to issue subpoenas arises by implication from Article I of the Constitution. *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927).

39.     The Select Committee, however, is not an authorized congressional committee because it fails to comport with its own authorizing resolution, House Resolution 503.

40.     The Speaker of the House failed to appoint members consistent with the authorizing resolution of the Select Committee. The Speaker has appointed only nine members of Congress to serve on the Select Committee; whereas the authorizing resolution instructs the Speaker "shall" appoint thirteen members. H. Res. 503 § 2(a), 117th Cong. (2021).

41.     Further, of those nine Members the Speaker has appointed, none of them were appointed after consultation with the Minority Leader, as is required by Section 2(a) of the authorizing resolution.

42.     The composition and membership of a purported committee, including the Select Committee, is material to its power to act. A committee's composition and membership can determine the direction of an inquiry and can serve to check, or temper, committee actions that could otherwise prove injurious to the operation of the government or the rights of private citizens. A committee that, without any check, exclusively serves the political purposes of one political party or faction is susceptible to grave conditional error and overreach.

43.     Here, the Select Committee has embarked upon an investigation that began with an inquiry into January 6th, but, in the absence of any tempering influence from the opposition party, has transformed into a broad assault on the Select Committee's political opponents, including private citizens.

44.     The Select Committee's failure to ever become properly constituted is a material violation of its authorizing Resolution. A private citizen aggrieved by a material violation of House rules has a defense against compulsory process. In *Yellin v. United States*, 374 U.S. 109, 114 (1963), the House Unamerican Affairs Committee failed to follow Rule IV, which required the committee to weigh certain considerations and act upon the express request of Yellin, the witness, for executive session because he believed his public testimony would harm his reputation. The Court held that because the committee had not followed Rule IV Yellin could not be convicted for contempt of Congress for failing to answer questions about his political affiliation and activities. It was not necessary to the Court's decision in *Yellin* that the committee would or should have granted Yellin's request for private, executive session testimony; the holding rests upon the committee's failure to actually apply Rule IV in considering his request. As *Yellin* shows, then, the House's failure to follow a rule is particularly significant where a person's fundamental rights

are involved. That is the case here, where Plaintiff's First and Fourth Amendment rights have been placed under continual pressure since the first subpoena.

45.     Thus, because the Select Committee as it currently stands—and stood at the time it issued the Subpoena in question—is not a duly constituted Select Committee under the applicable Resolution, it has no authority to act by issuing compulsory process against private entities and citizens. Chairman Thompson's subpoena is invalid and unenforceable.

## Count II
## (Subpoena Is Not Pertinent to the Authorized Inquiry)

46.     Plaintiff repeats, re-alleges, and incorporates the allegations in paragraphs 1–45 as if the same were set forth verbatim herein.

47.     The Select Committee's supposed inquiry focuses on the events of January 6th leading up to the Capitol breach, factors that may have caused individuals to enter the Capitol without permission, and the statutory process of certifying states' electoral votes.

48.     The Plaintiff was only involved in logistical planning and operations for the President's attendance and speech at the Ellipse Rally, a process that spanned at most 10 days. The Plaintiff's personal cell phone account information cannot aid Congress in drafting legislation about the January 6th Capitol breach, its causes, or the statutory process for transferring power. The same is true of the Plaintiff's complete record of phone calls and texts, the time spent conferring with various individuals who are political and personal associates of Plaintiff, and their location data over a three-month stretch of time, long before and long after the events of January 6th.

49.     The theory of Congress in investigating Plaintiff is that as Deputy Assistant to the President and Director of Presidential Advance, he had some knowledge of or role in the selection of speakers or of the content of speeches for the Ellipse Rally. There was no evidence adduced

from Plaintiff, and upon information and belief there is no evidence from any witness, that the Plaintiff participated in or has information about the selection of speakers or the content of speeches at the Rally. Nor was there any evidence that the Plaintiff participated in planning for or had knowledge of planning for even a peaceful assembly—a "march," copying the parlance of numerous public gatherings held on the National Mall—to the Capitol. Further, there is certainly no evidence that the Plaintiff participated in or had knowledge of planning or organizing an attack on the Capitol.

50.    There was no evidence from the Plaintiff, and upon information and belief, there was no evidence from any other witness, that the Plaintiff participated in or planned speeches that constitute incitement to any kind of imminent unlawful activity.

51.    And there was no evidence from the Plaintiff, and upon information and belief there was no evidence from any other witness, that anyone's speech at the Ellipse Rally actually led to an atmosphere of hatred, violence, or lawlessness, sufficient to cause otherwise peaceful attendees to surge to the Capitol and break in.

52.    The Select Committee claims to have already spoken with nearly 400 witnesses. See   https://january6th.house.gov/news/press-releases/select-committee-subpoenas-trump-allies-involved-attempts-challenge-or-overturn. Upon information and belief, it has reviewed hundreds of thousands or millions of documents that it has received from those witnesses. It is far past the outset of its investigation, and it is long past time for the Select Committee to have adduced the kind of evidence relating to Plaintiff that would suggest he is a core subject of the investigation, justifying the unusual step of a Congressional subpoena for phone records.

53.    Further, Congress has already received a production of records from the Plaintiff and has had as much time as it wanted—many hours at a time, with multiple counsel and staff

asking questions at the same time—to question Plaintiff. There is no reason to believe the Plaintiff has personal knowledge about the Ellipse Rally or the events of January 6th that was not fully explored in the document review or deposition. There is no reason to believe that the full record of personal and political contacts of the Plaintiff, extending for nearly two months before the Rally (long before it was even a remote possibility) and continuing for a month afterwards, is necessary to supplement their fulsome explanation of the events of the Rally and leading up to it.

54.    It is significant that the Verizon subpoena uniformly asks for three months of phone records for a large number of people, some of whom touch upon the Committee's inquiry for only a few days. The Plaintiff did not learn of the potential for what became the Rally until after Christmas, and his involvement in planning and coordinating the logistics of the President's appearance and speech at the Rally was complete on the day of the Rally (January 6th). The Plaintiff's complete involvement barely spanned ten days. Yet an inexplicable 3-month request was used for this Plaintiff and, apparently, countless others.

55.    Plaintiff's personal account information, and the complete record of his private phone and text contacts with all of his political and personal acquaintances for three months, is not pertinent to any inquiry into what happened on January 6th, or its causes. Plaintiff's account information also includes disclosing the phone numbers of his two minor children who cannot reasonably be thought to have any information or records pertaining to the Ellipse Rally, the events of January 6th or future proposed legislation. Instead, the subpoena is an impermissible attempt to harass the Plaintiff, identify his close colleagues, and potentially subject even those individuals and their carriers to subpoenas. Not only does this chill communication among these friends and political associates, it builds an opposition research file for the 2022 election cycle for the single party that mans, staffs, and controls the Select Committee.

56.     The "phone records" stage of the Select Committee's inquiry is not pertinent to the matters the House assigned to the Select Committee. For this reason alone, the Subpoena should be quashed.

## Count III
### (Subpoena Lacks a Legislative Purpose)

57.     Plaintiff repeats, re-alleges, and incorporates the allegations in paragraphs 1–56 as if the same were set forth verbatim herein

58.     A subpoena must not only be pertinent to the matter under investigation, it must be directed to produce facts relevant to a subject on which legislation may be had. *Trump v. Mazars USA, LLP*, 140 S.Ct. 2019, 2031, 207 L.Ed.2d 951 (2020) (regardless of whether a congressional subpoena is directed to the Executive branch or a private citizen, it must "concern[] a subject on which legislation could be had," and cannot "expose for the sake of exposure" or serve the purpose of "law enforcement").

59.     The House originally suggested that its inquiry into the "causes" of January 6th was intended to support potential legislation relating to Capitol Security and the process of certifying electoral votes on January 6th. More recently, it supplemented its list, claiming to be interested in passing legislation on "election integrity."

60.     In response to this Complaint and a stiffening legal response from other targets of compelled disclosure of purely private affairs, the Select Committee might suggest new legislative purposes. But no conceivable area of election-related legislation justifies the compelled disclosure of purely private affairs. Congress does not truly lack the necessary background factual record, and it does not need to threaten private citizens with jail time so that it can craft wise election legislation. For example, the Select Committee may claim that we can minimize the risk of another January 6th by banning or limiting rallies such as those that occurred at the Ellipse and elsewhere,

or by banning or limiting criticisms of election processes after the election. First, any such legislation would need to be within Congress's power under the First Amendment, a stumbling block to any sort of prior restraint or viewpoint-based to content-based restriction on speech or assembly. Second, assuming for the sake of argument that any such constitutionally-permissible legislation can be conceived, it would necessarily cover an exceedingly narrow field. Within that field, Congress does not truly lack the information it needs to legislate. For example, with respect to the Plaintiff, everything that happened and was said at the Ellipse Rally—everything needed to craft constitutionally-permissible restrictions on rallies, if they are in fact needed—has long been a matter of public record. Whether the legislative purpose is Capitol Security or election integrity, rally participants' purely private communications about lawful, peaceable activity are not part of the pertinent inquiry.

61.     Additionally, even if it were true that any of these legislative purposes are actually being explored by the Select Committee, they do not have any relationship to the Plaintiff's phone records. There is no conceivable link—even a highly attenuated chain—between say, the account and payment information from Plaintiff, and any Capitol security measures that may be passed. The same is true of the months-long list of personal and political contacts and associates that the Subpoena will yield. Rather than aiding Congress in weighing some hypothetical legislation, the contact information will be used to further harass Plaintiff, chill his association with personal and political acquaintances, build an opposition research file for 2022 for the party that completely runs the Select Committee without any involvement form the minority, and chill talented people from lending their skills to the Select Committee's political opponents. Because "recipients of legislative subpoenas retain their constitutional rights throughout the course of an investigation," *Mazars*, 140 S.Ct at 2031, this abuse of Congressional power renders the Subpoena unenforceable.

**Count IV**
**(Subpoena Violates the First Amendment Privilege)**

62.     Plaintiff repeats, re-alleges, and incorporates the allegations in paragraphs 1–61 as if the same were set forth verbatim herein.

63.     The First Amendment creates a "right to associate for the purpose of speaking," *Rumsfeld v. FAIR*, 547 U.S. 47, 68 (2006), and "compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958); *Bates v. Little Rock*, 361 U.S. 516, 523 (1960) ("It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute an effective restraint on freedom of association.") (brackets, ellipsis, & citation omitted).

64.     In cases of compelled disclosure, the Government must meet at least "exacting scrutiny," meaning that it must articulate a sufficiently important interest and show that the disclosure requirement is both substantially related to, and narrowly tailored to serve, that interest. *Americans for Prosperity Found. v. Bonta*, 141 S.Ct. 2373, 210 L. Ed. 2d 716 (2021). "Exacting scrutiny is triggered by state action which may have the effect of curtailing the freedom to associate, and by the possible deterrent effect of disclosure." *Id.* at 2399 (quotations and citations omitted).

65.     "Narrow tailoring is crucial where First Amendment activity is chilled–even if indirectly– '[b]ecause First Amendment freedoms need breathing space to survive.'" *Id.* at 2384 (citing *NACCP v. Button*, 371 U.S. 415, 433 (1963)).

66.     The First Amendment Privilege does not only provide protection against Congressional legislation or against local abuses of authority, it provides protection against Congressional attacks on First Amendment association via investigations. *Gibson v. Florida*

*Legislative Investigation Committee*, 372 U.S. 539 (1963) (applying the First Amendment, holding that the legislature could not seek the membership list of a legitimate organization because it had no subordinating interest which was compelling); *Watkins v. United States*, 354 U.S. 178, 197-98 (1957) ("The mere summoning of a witness and compelling him to testify, against his will, about his beliefs, expressions or associations is a measure of governmental interference" and can chill the witness and others from future speech and association).

67.     A subpoena to indiscriminately force disclosure of Plaintiff's personal and political associates over a three-month period is precisely the type of invasive inquiry that the Supreme Court has previously recognized can chill the exercise of First Amendment freedoms.

68.     Further, this is not a situation such as *Bonta*, where the government claimed it would comply with a legal duty not to disclose the compelled information. Here, the Select Committee has publicized much of what has been disclosed and has been active in the media in attempting to whip up sentiment against witnesses. There is no reason to believe that the information produced will be kept private or used only for limited purposes. Rather, the Plaintiff's contacts may well find that they, too, are next to receive Subpoenas.

69.     For the reasons discussed above, the Subpoena—coming after a complete document production and prolonged deposition that lasted as long as Congress desired—does not appear to advance any legitimate government informational interest. And if Congress has any remnant of an informational interest in learning the Plaintiff's personal and political contacts, the three-month period of inquiry, apparently uniformly applied to all witnesses regardless of their role or connection to the investigation, is by definition not narrowly tailored to that remnant of an interest. For that reason, the Subpoena violates the Plaintiff's First Amendment Privilege and should not be enforced.

**Count V**
**(Subpoena Violates the Fourth Amendment)**

70.     Plaintiff repeats, re-alleges, and incorporates the allegations in paragraphs 1–69 as if the same were set forth verbatim herein.

71.     Under the Fourth Amendment, Plaintiff has a reasonable expectation of privacy in information about who his personal and political contacts are, and how long he spoke with each of them. That is, the Plaintiff and the public at large do not expect that Congress can simply obtain from their carriers and then potentially disclose their entire personal and political contact history over a three-month period.

72.      Congress violated that reasonable expectation of privacy by indiscriminately seeking a mass of phone and text records that cannot have anything to do with the Capitol breach, the Ellipse Rally, or the certification of electoral votes.

73.     The Subpoena should not be enforced as violative of the Fourth Amendment. See *Carpenter v. United States*, 138 S.Ct. 2206, 201 L.Ed.2d 507 (2018).

**Count VI**
**(Congress Violated the Stored Communications Act by Demanding a Copy Be Made of the Relevant Data)**

74.     Plaintiff repeats, re-alleges, and incorporates the allegations in paragraphs 1–73 as if the same were set forth verbatim herein.

75.     The Select Committee requested that Defendant and other carriers make a backup copy of content and other account data in late August or early September 2021. At that time, upon information and belief, Verizon had one year of data regarding Plaintiff's texts, calls, and location.

76.     Under the Stored Communications Act, Congress had no authority to make such a request. Only a governmental entity can request backup and preservation of account data. 18 U.S.C. §2703(f). That request can be honored for no more than 90 days, and then may be renewed

for an additional 90 days upon the governmental entity's request. *Id*. Congress is not a governmental entity under the Stored Communications Act because, as the legislative branch, it is not a "department or agency of the United States." 18 U.S.C. § 2711(4).

77.     Upon information and belief, Congress, knowing it lacked authority, attempted to coerce Defendant and other entities into silence by requesting that they not tell account holders of the request.

78.     Upon information and belief, Defendant made such a backup copy of Plaintiff's data under pressure from Congress in late August or early September 2021. As a result of that action, data that Plaintiff reasonably expected would otherwise have been deleted after one year, in the ordinary course of Verizon's business, was preserved. This included data from November 1, 2020, to January 19, 2021, or approximately the date that was one year before the Subpoena was served.

79.     For the reasons set forth in Counts I to V, Congress had no authority to request Plaintiff's data at all, with or without a further request to make a backup copy. The only purpose of a backup copy is to provide the means for Congress to obtain what it cannot lawfully receive. To the extent such a copy was made in August or September 2021, it allowed Congress to obtain information within the Subpoena window that would otherwise have been destroyed. That data should now be destroyed and Plaintiff's call, text, and location data should not be preserved other than for the one-year period Verizon observes in the ordinary course of business.

**Prayer for Relief**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against the Defendant as follows:

1. A declaratory judgment that the Subpoena is invalid and unenforceable;

2. A permanent injunction quashing the Subpoena;

3. A permanent injunction prohibiting Defendant from disclosing, revealing, delivering, or producing the requested information, or otherwise complying with the Subpoena;

4. A permanent injunction requiring Defendant to destroy and refrain from producing any copy of Plaintiff's account data it made in violation of the Stored Communications Act;

5. Plaintiff's reasonable costs and expenses, including attorneys' fees; and

6. All other preliminary and permanent relief to which Plaintiff is entitled.

Dated: February 4, 2022

**KING MOENCH HIRNAIK & COLLINS, LLP**

/s/ *Matthew C. Moench*
Matthew C. Moench, Esq (031462007)
51 Gibraltar Drive, Suite 2F
Morris Plains, New Jersey 07950-1254
973-998-6860
973-998-6863 (facsimile)
MCM@kmhmlawfirm.com

*Counsel for Plaintiff*

Respectfully submitted,

**GRAVES GARRETT, LLC**

/s/ *Edward D. Greim*
Edward D. Greim (Mo. Bar #54034)*
Paul Brothers
1100 Main Street, Suite 2700
Kansas City, MO 64105
Phone: (816) 256-3181
Fax: (816) 256-5958
edgreim@gravesgarrett.com

*\*Pro Hac Vice Application Forthcoming*

# EXHIBIT A



VERIZON SECURITY SUBPOENA COMPLIANCE
180 WASHINGTON VALLEY ROAD
BEDMINSTER NJ 07921
Phone: 888-483-2600 Fax: 325-949-6916

January 21, 2022

ROBERT PEEDE
1301 S FERN ST, BOX 2834
ARLINGTON, VA, 22202-0834

Verizon Case #: 22119765
Docket / File #: House Subcommittee 01 19 22
Phone Number: 202-251-0339

Dear Customer,

This is to notify you that Verizon has received a subpoena requiring the production of certain records associated with the phone number referenced above.  According to our records, you are the subscriber of that phone number.

A copy of the subpoena is attached.  Section B, which identifies the phone number referenced above but also those of other Verizon subscribers, has been excluded.

Verizon received a letter from Edward D. Greim and Paul E. Brothers regarding your account, and a copy of this notification letter is being sent to them as well.

Any questions you have should be directed to the party who issued the subpoena.

Please be advised that unless Verizon receives a court document from you challenging the subpoena by February 7, 2022, Verizon is compelled to comply with the subpoena.  Copies of any court documents challenging the subpoena can be sent to Verizon via fax number 325-949-6916.

Very truly yours,

VERIZON SECURITY SUBPOENA COMPLIANCE

Enclosure

Cc: Edward D. Greim; Paul E. Brothers

# SUBPOENA

## BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

*To*  Verizon
Attn: VSAT
_____

You are hereby commanded to be and appear before the
Select Committee to Investigate the January 6th Attack on the United States Capitol
_____

of the House of Representatives of the United States at the place, date, and time specified below.

☑ **to produce the things identified on the attached schedule** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of production: 1540A Longworth House Office Building, Washington, DC 20515
>
> Date: February 2, 2022 _____          Time: 10:00 a.m. _____

☐ **to testify at a deposition** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of testimony: _____
>
> Date: _____          Time: _____

☐ **to testify at a hearing** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of testimony: _____
>
> Date: _____          Time _____

*To* any authorized staff member or the United States Marshals Service
_____

_____ to serve and make return.

Witness my hand and the seal of the House of Representatives of the United States, at

the city of Washington, D.C. this 19 day of January , 20 22 .

_____
*Chairman or Authorized Member*

Attest: _____
*Clerk*

**SCHEDULE**

In accordance with the attached definitions and instructions, you, Verizon, are hereby required to produce the documents and records ("Records") listed in Section A, below, **for the time period November 1, 2020, to January 31, 2021,** concerning the phone numbers listed in Section B, below (the "Phone Numbers"). This schedule does not call for the production of the content of any communications or location information.

**Please email the records to SELECT_CLERKS@MAIL.HOUSE.GOV** or, in the alternative, send them by mail to 1540A Longworth House Office Building, Washington, DC 20515, care of Jacob Nelson, Select Committee to Investigate the January 6th Attack on the U.S. Capitol.

**Section A – Records to Be Produced for Each Phone Number**

1.  Subscriber Information: All subscriber information for the Phone Number, including:

    a.  Name, subscriber name, physical address, billing address, e-mail address, and any other address and contact information;

    b.  All authorized users on the associated account;

    c.  All phone numbers associated with the account;

    d.  Length of service (including start date) and types of service utilized;

    e.  Telephone or instrument numbers (including MAC addresses), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN") Mobile Equipment Identifier ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI") associated with the accounts;

    f.  Activation date and termination date of each device associated with the account;

    g.  Any and all number and/or account number changes prior to and after the account was activated;

    h.  Other subscriber numbers or identities (including temporarily assigned network addresses and registration Internet Protocol ("IP") addresses); and

2.  Connection Records and Records of Session Times and Durations: All call, message (SMS & MMS), Internet Protocol ("IP"), and data-connection detail records associated with the Phone Numbers, including all phone numbers, IP addresses, or devices that communicated with the Phone Number via delivered and undelivered inbound, outbound, and routed calls, messages, voicemail, and data connections.

## **DOCUMENT PRODUCTION DEFINITIONS AND INSTRUCTIONS**

1.    In complying with this request, produce all responsive documents, regardless of classification level, that are in your possession, custody, or control, whether held by you or your past or present agents, employees, and representatives acting on your behalf. Produce all documents that you have a legal right to obtain, that you have a right to copy, or to which you have access, as well as documents that you have placed in the temporary possession, custody, or control of any third party.

2.    Requested documents, and all documents reasonably related to the requested documents, should not be destroyed, altered, removed, transferred, or otherwise made inaccessible to the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Committee').

3.    In the event that any entity, organization, or individual denoted in this request is or has been known by any name other than that herein denoted, the request shall be read also to include that alternative identification.

4.    The Committee's preference is to receive documents in a protected electronic form (i.e., password protected CD, memory stick, thumb drive, or secure file transfer) in lieu of paper productions. With specific reference to classified material, you will coordinate with the Committee's Security Officer to arrange for the appropriate transfer of such information to the Committee. This includes, but is not necessarily limited to: a) identifying the classification level of the responsive document(s); and b) coordinating for the appropriate transfer of any classified responsive document(s).

5.    Electronic document productions should be prepared according to the following standards:

      a.    If the production is completed through a series of multiple partial productions, field names and file order in all load files should match.

      b.    All electronic documents produced to the Committee should include the following fields of metadata specific to each document, and no modifications should be made to the original metadata:

            BEGDOC, ENDDOC, TEXT, BEGATTACH, ENDATTACH, PAGECOUNT, CUSTODIAN, RECORDTYPE, DATE, TIME, SENTDATE, SENTTIME, BEGINDATE, BEGINTIME, ENDDATE, ENDTIME, AUTHOR, FROM, CC, TO, BCC, SUBJECT, TITLE, FILENAME, FILEEXT, FILESIZE, DATECREATED, TIMECREATED, DATELASTMOD, TIMELASTMOD, INTMSGID, INTMSGHEADER, NATIVELINK, INTFILPATH, EXCEPTION, BEGATTACH.

6.  Documents produced to the Committee should include an index describing the contents of the production. To the extent more than one CD, hard drive, memory stick, thumb drive, zip file, box, or folder is produced, each should contain an index describing its contents.

7.  Documents produced in response to this request shall be produced together with copies of file labels, dividers, or identifying markers with which they were associated when the request was served.

8.  When you produce documents, you should identify the paragraph(s) or request(s) in the Committee's letter to which the documents respond.

9.  The fact that any other person or entity also possesses non-identical or identical copies of the same documents shall not be a basis to withhold any information.

10. The pendency of or potential for litigation shall not be a basis to withhold any information.

11. In accordance with 5 U.S.C.§ 552(d), the Freedom of Information Act (FOIA) and any statutory exemptions to FOIA shall not be a basis for withholding any information.

12. Pursuant to 5 U.S.C. § 552a(b)(9), the Privacy Act shall not be a basis for withholding information.

13. If compliance with the request cannot be made in full by the specified return date, compliance shall be made to the extent possible by that date. An explanation of why full compliance is not possible shall be provided along with any partial production, as well as a date certain as to when full production will be satisfied.

14. In the event that a document is withheld on any basis, provide a log containing the following information concerning any such document: (a) the reason it is being withheld, including, if applicable, the privilege asserted; (b) the type of document; (c) the general subject matter; (d) the date, author, addressee, and any other recipient(s); (e) the relationship of the author and addressee to each other; and (f) the basis for the withholding.

15. If any document responsive to this request was, but no longer is, in your possession, custody, or control, identify the document (by date, author, subject, and recipients), and explain the circumstances under which the document ceased to be in your possession, custody, or control. Additionally, identify where the responsive document can now be found including name, location, and contact information of the entity or entities now in possession of the responsive document(s).

16. If a date or other descriptive detail set forth in this request referring to a document

is inaccurate, but the actual date or other descriptive detail is known to you or is otherwise apparent from the context of the request, produce all documents that would be responsive as if the date or other descriptive detail were correct.

17. This request is continuing in nature and applies to any newly-discovered information. Any record, document, compilation of data, or information not produced because it has not been located or discovered by the return date shall be produced immediately upon subsequent location or discovery.

18. All documents shall be Bates-stamped sequentially and produced sequentially.

19. Upon completion of the production, submit a written certification, signed by you or your counsel, stating that: (1) a diligent search has been completed of all documents in your possession, custody, or control that reasonably could contain responsive documents; and
(2) all documents located during the search that are responsive have been produced to the Committee.

## Definitions

1. The term "document" means any written, recorded, or graphic matter of any nature whatsoever, regardless of classification level, how recorded, or how stored/displayed (e.g. on a social media platform) and whether original or copy, including, but not limited to, the following: memoranda, reports, expense reports, books, manuals, instructions, financial reports, data, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, communications, electronic mail (email), contracts, cables, notations of any type of conversation, telephone call, meeting or other inter-office or intra-office communication, bulletins, printed matter, computer printouts, computer or mobile device screenshots/screen captures, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto), and graphic or oral records or representations of any kind (including without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recordings and motion pictures), and electronic, mechanical, and electric records or representations of any kind (including, without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape, or otherwise. A document bearing any notation not a part of the original text is to be considered a separate document. A draft or non-identical copy is a separate document within the meaning of this term.

2.   The term "communication" means each manner or means of disclosure or exchange of information, regardless of means utilized, whether oral, electronic, by document or otherwise, and whether in a meeting, by telephone, facsimile, mail, releases, electronic message including email (desktop or mobile device), text message, instant message, MMS or SMS message, message application, through a social media or online platform, or otherwise.

3.   The terms "and" and "or" shall be construed broadly and either conjunctively or disjunctively to bring within the scope of this request any information that might otherwise be construed to be outside its scope. The singular includes plural number, and vice versa. The masculine includes the feminine and neutral genders.

4.   The term "including" shall be construed broadly to mean "including, but not limited to."

5.   The term "Company" means the named legal entity as well as any units, firms, partnerships, associations, corporations, limited liability companies, trusts, subsidiaries, affiliates, divisions, departments, branches, joint ventures, proprietorships, syndicates, or other legal, business or government entities over which the named legal entity exercises control or in which the named entity has any ownership whatsoever.

6.   The term "identify," when used in a question about individuals, means to provide the following information: (a) the individual's complete name and title; (b) the individual's business or personal address and phone number; and (c) any and all known aliases.

7.   The term "related to" or "referring or relating to," with respect to any given subject, means anything that constitutes, contains, embodies, reflects, identifies, states, refers to, deals with, or is pertinent to that subject in any manner whatsoever.

8.   The term "employee" means any past or present agent, borrowed employee, casual employee, consultant, contractor, de facto employee, detailee, assignee, fellow, independent contractor, intern, joint adventurer, loaned employee, officer, part-time employee, permanent employee, provisional employee, special government employee, subcontractor, or any other type of service provider.

9.   The term "individual" means all natural persons and all persons or entities acting on their behalf.

# EXHIBIT B

# SUBPOENA

## BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

*To* Robert Peede

You are hereby commanded to be and appear before the

Select Committee to Investigate the January 6th Attack on the United States Capitol

of the House of Representatives of the United States at the place, date, and time specified below.

☑ **to produce the things identified on the attached schedule** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of production: 1540A Longworth House Office Building, Washington, DC 20515
>
> Date: December 23, 2021                    Time: 10:00 AM

☑ **to testify at a deposition** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of testimony: United States Capitol Building, Washington, DC 20515
>
> Date: January 7, 2022                    Time: 10:00 AM

☐ **to testify at a hearing** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of testimony: _____
>
> Date: _____          Time _____

*To* any authorized staff member or the United States Marshals Service

_____ to serve and make return.

Witness my hand and the seal of the House of Representatives of the United States, at

the city of Washington, D.C. this 9th day of December , 20 21 .

Attest: _____

*Clerk*

_____
*Chairman or Authorized Member*

## PROOF OF SERVICE

---

Subpoena for

     Robert Peede

Address  710 12th St. S

 Arlington, VA 22202

before the  Select Committee to Investigate the January 6th Attack on the United States Capitol

*U.S. House of Representatives*
*117th Congress*

---

Served by (print name)

Title

Manner of service



Date

Signature of Server

Address

BENNIE G. THOMPSON, MISSISSIPPI
CHAIRMAN

ZOE LOFGREN, CALIFORNIA
ADAM B. SCHIFF, CALIFORNIA
PETE AGUILAR, CALIFORNIA
STEPHANIE N. MURPHY, FLORIDA
JAMIE RASKIN, MARYLAND
ELAINE G. LURIA, VIRGINIA
LIZ CHENEY, WYOMING
ADAM KINZINGER, ILLINOIS



U.S. House of Representatives
Washington, DC 20515

january6th.house.gov
(202) 225-7800

### One Hundred Seventeenth Congress
### Select Committee to Investigate the January 6th Attack on the United States Capitol

December 9, 2021

<u>VIA ELECTRONIC MAIL</u>
Robert "Bobby" Peede, Jr.
710 12th St. S
Arlington, VA 22202
bobbypeede@gmail.com
bobbypeede@me.com

Dear Mr. Peede:

Pursuant to the authorities set forth in House Resolution 503 and the rules of the House of Representatives, the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee") hereby transmits a subpoena that compels you to produce the documents set forth in the accompanying Schedule by December 23, 2021, and to appear for a deposition on January 7, 2022.

The Select Committee is investigating the facts, circumstances, and causes of the January 6th attack and issues relating to the peaceful transfer of power, in order to identify and evaluate lessons learned and to recommend to the House and its relevant committees corrective laws, policies, procedures, rules, or regulations. The inquiry includes examination of how various individuals and entities coordinated their activities leading up to the events of January 6, 2021.

The Select Committee's investigation has revealed credible evidence of your involvement in and knowledge of the events within the scope of the Select Committee's inquiry. Documents and information provided to the Select Committee indicate that you were present for a meeting with then President Trump on January 4, 2021, with Max Miller and Katrina Pierson, to discuss the rally to be held on the Ellipse in Washington, D.C. on January 6, 2021, in support of the President and his allegations of election fraud. The meeting took place in the President's private dining room off the Oval Office. The discussion centered on who the President wanted to speak at the rally.

Accordingly, the Select Committee seeks documents and a deposition regarding these and other matters that are within the scope of the Select Committee's inquiry. A copy of the rules governing Select Committee depositions, and document production definitions and instructions are attached.

Mr. Robert Peede
Page 2

Please contact staff for the Select Committee at 202-225-7800 to arrange for the production of documents.

Sincerely,

Bennie G. Thompson
Chairman

Mr. Robert Peede
Page 3

## **SCHEDULE**

In accordance with the attached definitions and instructions, you, Robert "Bobby" Peede, Jr., are hereby required to produce all documents and communications in your possession, custody, or control—including any such documents or communications stored or located on personal devices (e.g., personal computers, cellular phones, tablets, etc.), in personal accounts, and/or on personal applications (e.g., email accounts, contact lists, calendar entries, etc.)— referring or relating to the following items:

1. For the time period December 19, 2020, to January 31, 2021, all documents and communications concerning the rally Women for America First held on the Ellipse in Washington, D.C. on January 6, 2021, at which President Donald Trump and others spoke, to include but not limited to any documents and communications concerning discussions about who to include in the speakers list.

2. For the time period January 6 to 31, 2021, all documents and communications related to the January 6, 2021, attack on the U.S. Capitol.

## DOCUMENT PRODUCTION DEFINITIONS AND INSTRUCTIONS

1.  In complying with this request, produce all responsive documents, regardless of classification level, that are in your possession, custody, or control, whether held by you or your past or present agents, employees, and representatives acting on your behalf. Produce all documents that you have a legal right to obtain, that you have a right to copy, or to which you have access, as well as documents that you have placed in the temporary possession, custody, or control of any third party.

2.  Requested documents, and all documents reasonably related to the requested documents, should not be destroyed, altered, removed, transferred, or otherwise made inaccessible to the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Committee').

3.  In the event that any entity, organization, or individual denoted in this request is or has been known by any name other than that herein denoted, the request shall be read also to include that alternative identification.

4.  The Committee's preference is to receive documents in a protected electronic form (i.e., password protected CD, memory stick, thumb drive, or secure file transfer) in lieu of paper productions. With specific reference to classified material, you will coordinate with the Committee's Security Officer to arrange for the appropriate transfer of such information to the Committee. This includes, but is not necessarily limited to: a) identifying the classification level of the responsive document(s); and b) coordinating for the appropriate transfer of any classified responsive document(s).

5.  Electronic document productions should be prepared according to the following standards:

    a.  If the production is completed through a series of multiple partial productions, field names and file order in all load files should match.

    b.  All electronic documents produced to the Committee should include the following fields of metadata specific to each document, and no modifications should be made to the original metadata:

        BEGDOC, ENDDOC, TEXT, BEGATTACH, ENDATTACH, PAGECOUNT, CUSTODIAN, RECORDTYPE, DATE, TIME, SENTDATE, SENTTIME, BEGINDATE, BEGINTIME, ENDDATE, ENDTIME, AUTHOR, FROM, CC, TO, BCC, SUBJECT, TITLE, FILENAME, FILEEXT, FILESIZE, DATECREATED, TIMECREATED, DATELASTMOD, TIMELASTMOD, INTMSGID, INTMSGHEADER, NATIVELINK, INTFILPATH, EXCEPTION, BEGATTACH.

6.   Documents produced to the Committee should include an index describing the contents of the production. To the extent more than one CD, hard drive, memory stick, thumb drive, zip file, box, or folder is produced, each should contain an index describing its contents.

7.   Documents produced in response to this request shall be produced together with copies of file labels, dividers, or identifying markers with which they were associated when the request was served.

8.   When you produce documents, you should identify the paragraph(s) or request(s) in the Committee's letter to which the documents respond.

9.   The fact that any other person or entity also possesses non-identical or identical copies of the same documents shall not be a basis to withhold any information.

10.   The pendency of or potential for litigation shall not be a basis to withhold any information.

11.   In accordance with 5 U.S.C.§ 552(d), the Freedom of Information Act (FOIA) and any statutory exemptions to FOIA shall not be a basis for withholding any information.

12.   Pursuant to 5 U.S.C. § 552a(b)(9), the Privacy Act shall not be a basis for withholding information.

13.   If compliance with the request cannot be made in full by the specified return date, compliance shall be made to the extent possible by that date. An explanation of why full compliance is not possible shall be provided along with any partial production, as well as a date certain as to when full production will be satisfied.

14.   In the event that a document is withheld on any basis, provide a log containing the following information concerning any such document: (a) the reason it is being withheld, including, if applicable, the privilege asserted; (b) the type of document; (c) the general subject matter; (d) the date, author, addressee, and any other recipient(s); (e) the relationship of the author and addressee to each other; and (f) the basis for the withholding.

15.   If any document responsive to this request was, but no longer is, in your possession, custody, or control, identify the document (by date, author, subject, and recipients), and explain the circumstances under which the document ceased to be in your possession, custody, or control. Additionally, identify where the responsive document can now be found including name, location, and contact information of the entity or entities now in possession of the responsive document(s).

16.   If a date or other descriptive detail set forth in this request referring to a document

is inaccurate, but the actual date or other descriptive detail is known to you or is otherwise apparent from the context of the request, produce all documents that would be responsive as if the date or other descriptive detail were correct.

17. This request is continuing in nature and applies to any newly-discovered information. Any record, document, compilation of data, or information not produced because it has not been located or discovered by the return date shall be produced immediately upon subsequent location or discovery.

18. All documents shall be Bates-stamped sequentially and produced sequentially.

19. Upon completion of the production, submit a written certification, signed by you or your counsel, stating that: (1) a diligent search has been completed of all documents in your possession, custody, or control that reasonably could contain responsive documents; and
(2) all documents located during the search that are responsive have been produced to the Committee.

## Definitions

1. The term "document" means any written, recorded, or graphic matter of any nature whatsoever, regardless of classification level, how recorded, or how stored/displayed (e.g. on a social media platform) and whether original or copy, including, but not limited to, the following: memoranda, reports, expense reports, books, manuals, instructions, financial reports, data, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, communications, electronic mail (email), contracts, cables, notations of any type of conversation, telephone call, meeting or other inter-office or intra-office communication, bulletins, printed matter, computer printouts, computer or mobile device screenshots/screen captures, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto), and graphic or oral records or representations of any kind (including without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recordings and motion pictures), and electronic, mechanical, and electric records or representations of any kind (including, without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape, or otherwise. A document bearing any notation not a part of the original text is to be considered a separate document. A draft or non-identical copy is a separate document within the meaning of this term.

2.  The term "communication" means each manner or means of disclosure or exchange of information, regardless of means utilized, whether oral, electronic, by document or otherwise, and whether in a meeting, by telephone, facsimile, mail, releases, electronic message including email (desktop or mobile device), text message, instant message, MMS or SMS message, message application, through a social media or online platform, or otherwise.

3.  The terms "and" and "or" shall be construed broadly and either conjunctively or disjunctively to bring within the scope of this request any information that might otherwise be construed to be outside its scope. The singular includes plural number, and vice versa. The masculine includes the feminine and neutral genders.

4.  The term "including" shall be construed broadly to mean "including, but not limited to."

5.  The term "Company" means the named legal entity as well as any units, firms, partnerships, associations, corporations, limited liability companies, trusts, subsidiaries, affiliates, divisions, departments, branches, joint ventures, proprietorships, syndicates, or other legal, business or government entities over which the named legal entity exercises control or in which the named entity has any ownership whatsoever.

6.  The term "identify," when used in a question about individuals, means to provide the following information: (a) the individual's complete name and title; (b) the individual's business or personal address and phone number; and (c) any and all known aliases.

7.  The term "related to" or "referring or relating to," with respect to any given subject, means anything that constitutes, contains, embodies, reflects, identifies, states, refers to, deals with, or is pertinent to that subject in any manner whatsoever.

8.  The term "employee" means any past or present agent, borrowed employee, casual employee, consultant, contractor, de facto employee, detailee, assignee, fellow, independent contractor, intern, joint adventurer, loaned employee, officer, part-time employee, permanent employee, provisional employee, special government employee, subcontractor, or any other type of service provider.

9.  The term "individual" means all natural persons and all persons or entities acting on their behalf.

health, safety, and well-being of others present in the Chamber and surrounding areas. Members and staff will not be permitted to enter the Hall of the House without wearing a mask. Masks will be available at the entry points for any Member who forgets to bring one. The Chair views the failure to wear a mask as a serious breach of decorum. The Sergeant-at-Arms is directed to enforce this policy. Based upon the health and safety guidance from the attending physician and the Sergeant-at-Arms, the Chair would further advise that all Members should leave the Chamber promptly after casting their votes. Furthermore, Members should avoid congregating in the rooms leading to the Chamber, including the Speaker's lobby. The Chair will continue the practice of providing small groups of Members with a minimum of 5 minutes within which to cast their votes. Members are encouraged to vote with their previously assigned group. After voting, Members must clear the Chamber to allow the next group a safe and sufficient opportunity to vote. It is essential for the health and safety of Members, staff, and the U.S. Capitol Police to consistently practice social distancing and to ensure that a safe capacity be maintained in the Chamber at all times. To that end, the Chair appreciates the cooperation of Members and staff in preserving order and decorum in the Chamber and in displaying respect and safety for one another by wearing a mask and practicing social distancing. All announced policies, including those addressing decorum in debate and the conduct of votes by electronic device, shall be carried out in harmony with this policy during the pendency of a covered period.

---

## 117TH CONGRESS REGULATIONS FOR USE OF DEPOSITION AUTHORITY

COMMITTEE ON RULES,
HOUSE OF REPRESENTATIVES,
*Washington, DC, January 4, 2021.*
Hon. NANCY PELOSI,
*Speaker, House of Representatives,*
*Washington, DC.*

MADAM SPEAKER: Pursuant to section 3(b) of House Resolution 8, 117th Congress, I hereby submit the following regulations regarding the conduct of depositions by committee and select committee counsel for printing in the Congressional Record.

Sincerely,

JAMES P. MCGOVERN,
*Chairman, Committee on Rules.*
REGULATIONS FOR THE USE OF DEPOSITION AUTHORITY

1. Notices for the taking of depositions shall specify the date, time, and place of examination. Depositions shall be taken under oath administered by a member or a person otherwise authorized to administer oaths. Depositions may continue from day to day.

2. Consultation with the ranking minority member shall include three days' notice before any deposition is taken. All members of the committee shall also receive three days written notice that a deposition will be taken, except in exigent circumstances. For purposes of these procedures, a day shall not include Saturdays, Sundays, or legal holidays except when the House is in session on such a day.

3. Witnesses may be accompanied at a deposition by personal, nongovernmental counsel to advise them of their rights. Only members, committee staff designated by the chair or ranking minority member, an official reporter, the witness, and the witness's counsel are permitted to attend. Observers or counsel for other persons, including counsel for government agencies, may not attend.

4. The chair of the committee noticing the deposition may designate that deposition as part of a joint investigation between committees, and in that case, provide notice to the members of the committees. If such a designation is made, the chair and ranking minority member of the additional committee(s) may designate committee staff to attend pursuant to regulation 3. Members and designated staff of the committees may attend and ask questions as set forth below.

5. A deposition shall be conducted by any member or committee counsel designated by the chair or ranking minority member of the Committee that noticed the deposition. When depositions are conducted by committee counsel, there shall be no more than two committee counsel permitted to question a witness per round. One of the committee counsel shall be designated by the chair and the other by the ranking minority member per round.

6. Deposition questions shall be propounded in rounds. The length of each round shall not exceed 60 minutes per side, and shall provide equal time to the majority and the minority. In each round, the member(s) or committee counsel designated by the chair shall ask questions first, and the member(s) or committee counsel designated by the ranking minority member shall ask questions second.

7. Objections must be stated concisely and in a non-argumentative and non-suggestive manner. A witness's counsel may not instruct a witness to refuse to answer a question, except to preserve a privilege. In the event of professional, ethical, or other misconduct by the witness's counsel during the deposition, the Committee may take any appropriate disciplinary action. The witness may refuse to answer a question only to preserve a privilege. When the witness has refused to answer a question to preserve a privilege, members or staff may (i) proceed with the deposition, or (ii) either at that time or at a subsequent time, seek a ruling from the Chair either by telephone or otherwise. If the Chair overrules any such objection and thereby orders a witness to answer any question to which an objection was lodged, the witness shall be ordered to answer. If a member of the committee chooses to appeal the ruling of the chair, such appeal must be made within three days, in writing, and shall be preserved for committee consideration. The Committee's ruling on appeal shall be filed with the clerk of the Committee and shall be provided to the members and witness no less than three days before the reconvened deposition. A deponent who refuses to answer a question after being directed to answer by the chair may be subject to sanction, except that no sanctions may be imposed if the ruling of the chair is reversed by the committee on appeal.

8. The Committee chair shall ensure that the testimony is either transcribed or electronically recorded or both. If a witness's testimony is transcribed, the witness or the witness's counsel shall be afforded an opportunity to review a copy. No later than five days after the witness has been notified of the opportunity to review the transcript, the witness may submit suggested changes to the chair. Committee staff may make any typographical and technical changes. Substantive changes, modifications, clarifications, or amendments to the deposition transcript submitted by the witness must be accompanied by a letter signed by the witness requesting the changes and a statement of the witness's reasons for each proposed change. Any substantive changes, modifications, clarifications, or amendments shall be included as an appendix to the transcript conditioned upon the witness signing the transcript.

9. The individual administering the oath, if other than a member, shall certify on the transcript that the witness was duly sworn. The transcriber shall certify that the transcript is a true record of the testimony, and the transcript shall be filed, together with any electronic recording, with the clerk of the committee in Washington, DC. Depositions shall be considered to have been taken in Washington, DC, as well as the location actually taken once filed there with the clerk of the committee for the committee's use. The chair and the ranking minority member shall be provided with a copy of the transcripts of the deposition at the same time.

10. The chair and ranking minority member shall consult regarding the release of deposition testimony, transcripts, or recordings, and portions thereof. If either objects in writing to a proposed release of a deposition testimony, transcript, or recording, or a portion thereof, the matter shall be promptly referred to the committee for resolution.

11. A witness shall not be required to testify unless the witness has been provided with a copy of section 3(b) of H. Res. 8, 117th Congress, and these regulations.

---

## REMOTE COMMITTEE PROCEEDINGS REGULATIONS PURSUANT TO HOUSE RESOLUTION 8, 117TH CONGRESS

COMMITTEE ON RULES,
HOUSE OF REPRESENTATIVES,
*Washington, DC, January 4, 2021.*
Hon. NANCY PELOSI,
*Speaker, House of Representatives,*
*Washington, DC.*

MADAM SPEAKER: Pursuant to section 3(s) of House Resolution 8, 117th Congress, I hereby submit the following regulations regarding remote committee proceedings for printing in the CONGRESSIONAL RECORD.

Sincerely,

JAMES P. MCGOVERN,
*Chairman,*
*Committee on Rules.*

REMOTE COMMITTEE PROCEEDINGS REGULATIONS PURSUANT TO HOUSE RESOLUTION 8

A. PRESENCE AND VOTING

1. Members participating remotely in a committee proceeding must be visible on the software platform's video function to be considered in attendance and to participate unless connectivity issues or other technical problems render the member unable to fully participate on camera (except as provided in regulations A.2 and A.3).

2. The exception in regulation A.1 for connectivity issues or other technical problems does not apply if a point of order has been made that a quorum is not present. Members participating remotely must be visible on the software platform's video function in order to be counted for the purpose of establishing a quorum.

3. The exception in regulation A.1 for connectivity issues or other technical problems does not apply during a vote. Members participating remotely must be visible on the software platform's video function in order to vote.

4. Members participating remotely off-camera due to connectivity issues or other technical problems pursuant to regulation A.1 must inform committee majority and minority staff either directly or through staff.

5. The chair shall make a good faith effort to provide every member experiencing connectivity issues an opportunity to participate fully in the proceedings, subject to regulations A.2 and A.3.

# H. Res. 8

# *In the House of Representatives, U. S.,*

*January 4, 2021.*

*Resolved,*

## SECTION 1. ADOPTION OF THE RULES OF THE ONE HUNDRED SIXTEENTH CONGRESS.

The Rules of the House of Representatives of the One Hundred Sixteenth Congress, including applicable provisions of law or concurrent resolution that constituted rules of the House at the end of the One Hundred Sixteenth Congress, are adopted as the Rules of the House of Representatives of the One Hundred Seventeenth Congress, with amendments to the standing rules as provided in section 2, and with other orders as provided in this resolution.

## SEC. 2. CHANGES TO THE STANDING RULES.

(a) CONFORMING CHANGE.—In clause 2(i) of rule II—

(1) strike the designation of subparagraph (1); and

(2) strike subparagraph (2).

(b) OFFICE OF DIVERSITY AND INCLUSION AND OFFICE OF THE WHISTLEBLOWER OMBUDS.—

16

**SEC. 3. SEPARATE ORDERS.**

(a) MEMBER DAY HEARING REQUIREMENT.—During the first session of the One Hundred Seventeenth Congress, each standing committee (other than the Committee on Ethics) or each subcommittee thereof (other than a subcommittee on oversight) shall hold a hearing at which it receives testimony from Members, Delegates, and the Resident Commissioner on proposed legislation within its jurisdiction, except that the Committee on Rules may hold such hearing during the second session of the One Hundred Seventeenth Congress.

(b) DEPOSITION AUTHORITY.—

(1) During the One Hundred Seventeenth Congress, the chair of a standing committee (other than the Committee on Rules), and the chair of the Permanent Select Committee on Intelligence, upon consultation with the ranking minority member of such committee, may order the taking of depositions, including pursuant to subpoena, by a member or counsel of such committee.

(2) Depositions taken under the authority prescribed in this subsection shall be subject to regulations issued by the chair of the Committee on Rules and printed in the Congressional Record.

(c) WAR POWERS RESOLUTION.—During the One Hundred Seventeenth Congress, a motion to discharge a measure introduced pursuant to section 6 or section 7 of the War

•HRES 8 EH